**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**RYAN N. WRIGHT,**

       **Plaintiff,**

                              **Civil Action 2:13-cv-669**
                              **Magistrate Judge Elizabeth P. Deavers**

   **v.**

**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

**<u>OPINION AND ORDER</u>**

      Plaintiff, Ryan N. Wright, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income.  This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 10), the Commissioner's Memorandum in Opposition (ECF No. 17), Plaintiff's Reply (ECF No. 18) and the administrative record (ECF No. 9).  For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

**I.      BACKGROUND**

      Plaintiff protectively filed his application for benefits on February 26, 2010, alleging that he has been disabled since March 24, 2000, at age 11.[1]  (R. at 116-19.)  Plaintiff alleges disability as a result of obsessive compulsive disorder ("OCD"), Asperger's Syndrome, and a limited ability to read and write.  (R. at 138.)  Plaintiff's application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.

---

[1]Regardless of the actual or alleged onset of disability, a SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application.  *See* 20 C.F.R. §416.335.

Administrative Law Judge Curt Marceille ("ALJ") held a video hearing on February 29, 2012, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 35-44.)  Plaintiff's father, Floyd Wright, appeared and testified as a witness.  (R. at 45-51.)  James Breen, a vocational expert, also appeared and testified at the hearing.  (R. at 51-54.)  On March 12, 2012, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 11-27.)  On May 31, 2013, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-5.)  Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

At the February 29, 2012 hearing, Plaintiff testified that he was not working and that he had last worked one year prior to the hearing as a cart pusher at a Wal-Mart store.  (R. at 35-37.)  He indicated that he stopped working at Wal-Mart after two and one-half months because of a back injury.  (R. at 36.)  Plaintiff testified that he has difficulty talking to others,  especially new people, but that he did not have problems getting along with coworkers during his employment at Wal-Mart.  (R. at 37-38.)  He added that he thought he could work at a job where he did not have to speak to other people so long as "they showed [him] the ropes."  Plaintiff testified that he thought he could complete an eight-hour work day if he was able to stand up every twenty minutes.  (R. at 42.)  He stated that he was not presently looking for work.

Plaintiff also testified that he could read and write, but that he struggles with spelling.  (*Id.*)  He indicated that he graduated from high school and attended special education classes.  (*Id.*)  Plaintiff stated that he is able to add and subtract, but has difficulty handling money.  (R. at

2

40.) He further indicated that he could perform household chores such as dusting and vacuuming. (*Id*.)

Plaintiff testified that he enjoyed reading science fiction and history on-line and that he could "somewhat" use a computer. (R. at 38-39.) He indicated that he also plays video games on the PlayStation 3. (R. at 40.) He stated that he does not drive, he lives with his parents, and takes care of the family pets. (R. at 39) Plaintiff testified that he does not have any friends that he socializes with and that he does not go to activities outside of his house. (R. at 42.)

## B.    Floyd Wright's Testimony

According to Mr. Wright, Plaintiff's father, Plaintiff has struggled from since he was young. Mr. Wright testified that Plaintiff was born premature and spent several days in the hospital. (R. at 45-46.) He indicated that Plaintiff experienced developmental delays and went to a preschool for children with developmental disabilities before transitioning to a regular school. Mr. Wright stated that Plaintiff struggled in first grade and was placed in disability classes until he graduated. He further stated that Plaintiff has always struggled with handwriting.

Mr. Wright testified that the Ohio Bureau of Vocational Rehabilitation helped Plaintiff obtain his job at Wal-Mart. Mr. Wright expressed his opinion that Plaintiff took on the job at Wal-Mart during the most difficult time of the year because it was the holiday season. (R. at 46.) Mr. Wright indicated that Plaintiff tried his best, but that he became frustrated when supervisors and co-workers gave him conflicting instructions. (*Id*.) Mr. Wright stated that Plaintiff ultimately quit because of this frustration. He added that since Plaintiff got frustrated and strained his back, he has not looked for work. (R. at 51.)

3

Mr. Wright testified that Plaintiff becomes frustrated when he has to deal with "different situations" and feels uncomfortable with strangers out in public.  (R. at 47.)  Mr. Wright noted Plaintiff does not utilize the phone and that he does not drive because he failed the driver's test.  (R. at 47.)  With regard to Plaintiff's OCD, Mr. Wright testified that when Plaintiff focuses on one issue or one interest, "it's that for days."  (R. at 48.)  Mr. Wright testified that Plaintiff does not typically go anywhere and that he spends two-thirds of a typical day by himself.  (R. at 49.)  Mr. Wright noted Plaintiff does not have set chores, but that he will do something if asked and that he only "occasionally" needs to be reminded to perform a task he has been asked to complete.  (*Id.*)  Mr. Wright confirmed that Plaintiff takes Prozac and added that it helps with his frustration tolerance.  (R. at 50.)

## C.     Vocational Expert Testimony

James Breen testified as the vocational expert ("VE").  (R. at 51-54.)  The ALJ proposed a hypothetical regarding an individual with Plaintiff's age, education, work experience, and residual functional capacity for a full range of work at all exertional levels but who has the following limitations: limited to simple, routine, repetitive tasks with one and two-step instructions that would involve only occasional decision-making and workplace changes, if any, in a static, unchanging work environment; and limited to occasional, superficial interaction with coworkers and supervisors, but no interaction with the public.  (R. at 52.)  The VE testified that such an individual would be able to perform plenty of jobs at the unskilled, SVP (specific vocational preparation) level two, medium exertional level work.  He identified the following representative jobs:  hand packager, with 1,300 jobs in the region and 60,000 jobs in the state of Ohio; janitor, with 2,600 jobs in the region and 102,000 jobs in the state of Ohio; and a warehouse worker, with 850 jobs in the region and 50,000 jobs in the state.  (R. at 52-53.)  The

4

VE further testified that the hypothetical individual would also be able to perform unskilled, SVP level one jobs. The VE identified the following representative jobs: cleaner, performed at the medium exertional level and involving a change of the interior and exterior of transportation vehicles, with 300 jobs in the regional economy and 12,000 jobs in the state of Ohio; plant laborer, performed at the medium exertional level, with 700 jobs in the region and 30,000 jobs in the state of Ohio; and a hand packager, performed at the light exertional level, with 550 jobs in the region and 30,000 jobs in the state of Ohio. (R. at 53.) The VE stated that his testimony was consistent with the Dictionary of Occupational Titles. (R. at 53-54.)

Upon cross-examination from Plaintiff's counsel, the VE testified that competitive employment would be precluded if the individual needed to be off task twenty percent of the time due to deterioration and an inability to focus. (R. at 54.)

## III.    MEDICAL AND EDUCATION RECORDS

### A.    Michael Thomasgard, M.D.

Dr. Thomasgard evaluated Plaintiff in April 1997, when he was in first grade at the Children's Hospital Behavior and Learning Disability Clinic. (R. at 248-49.) Plaintiff was enrolled in a preschool for children with developmental delays when he was three years old. He did well in kindergarten but struggled in first grade. Plaintiff reported that he was teased at school. He cried on several occasions during the interview while discussing how stressful school was for him. Dr. Thomasgard determined that Plaintiff had probable learning difficulties, significant emotional challenges, and gross motor difficulties. Dr. Thomasgard recommended that Plaintiff be tested by a psychologist to determine his intelligence and academic achievement levels.

### B.    Woodlands Centers

In February 1998, Plaintiff was evaluated by psychiatrist Nancy Graham, M.D., because he reported hearing voices and was developing fears that his classmates may drug or harm him. Plaintiff also became increasingly anxious about cleanliness and would repeat certain actions. (R. at 243.)  His mother noted he was born six weeks early through an emergency C-section and required a twelve-day stay in the hospital.  (R. at 244.)  On mental status examination, Dr. Graham described Plaintiff as an "an immaculately dressed little boy."  (*Id.*)  Dr. Graham noted that Plaintiff was friendly and open.  She further noted that he spoke with an obvious speech defect and was at times difficult to comprehend.  She also noted that Plaintiff moved with some awkwardness.  (R. at 245.)  Plaintiff reported his mood as angry, and Dr. Graham described his affect as broad without lability.  Dr. Graham found Plaintiff had no insight and that his judgment was poor to standard social situations.  She diagnosed Plaintiff with OCD, Asperger's Syndrome of which the OCD may be a competent, rule-out anxiety disorder, and rule-out depression. Medication was discussed.  (R. at 246-47.)

In June 2000, Plaintiff's mother reported Plaintiff was depressed and was expressing suicidal ideation at the end of the school year.  She also reported that Plaintiff had tried to ride his bike into a car, but that his sister and father stopped him.  She also indicated that Plaintiff had thought about sticking himself with scissors, but she and his father put the scissors away. Plaintiff reported that "he is no longer thinking that way now that school is out and kids are no longer teasing him."  (R. at 222.)  Dr. Graham noted that Plaintiff was earning all A's in school and that he had been described as "one of the best behaved children in the classroom."  (*Id.*)

In August 2000, when Plaintiff was eleven years old, his mother related Plaintiff's experience of being evaluated for Social Security.  She indicated that the psychologist who examined Plaintiff determined that he did not have Asperger's disorder, was not in the least

disabled, and was, in fact, perfectly normal. Plaintiff's mother reported that Plaintiff had a good summer and that she did not have any complaints. (R. at 221.)

In November 2000, Dr. Graham found that Plaintiff's response to services was favorable and noted that he had not changed since the prior session. She continued Plaintiff's diagnoses of OCD, Asperger's Syndrome, and a depressive disorder related to bullying and taunting by peers. (R. at 219.)

**C.     Holzer Clinic**

Plaintiff saw psychiatrist Edward Dachowski, M.D., for mental health treatment at the Holzer Clinic from 2002 until at least January 2011. (R. at 262-68, 298-304, 307-08, 311-12, 322-23, 325-26.)

In January 2009, Dr. Dachowski noted that Plaintiff was doing well in terms of his mood and that he was not anxious or nervous. (R. at 262.) Plaintiff reported not having difficulties with obsessive compulsive symptoms that he had struggled with in the past. Dr. Dachowski noted that Plaintiff was quiet and reserved and rarely initiated conversation. Dr. Dachowski assessed Plaintiff's cognitive skills at the 4th to 6th grade level and his insight and judgment to be variable. (R. at 262.)

In May 2009, Plaintiff reported no difficulties regulating mood and no reoccurrences of obsessive compulsive type symptoms. Dr. Dachowski found Plaintiff to be friendly and pleasant, as well as quiet and reserved. (R. at 264.)

In August 2009, Plaintiff reported essentially no changes in his mood or behavior and indicated that he was actively seeking employment. (R. at 266.) Dr. Dachowski described Plaintiff as friendly and pleasant. He suggested that Plaintiff consider seeking employment at the local retail establishments and food processing facilities.

7

In December 2009, Plaintiff reported doing fairly well with mood and that he was happy and pleased with himself.  Dr. Dachowski assessed OCD in remission and borderline intellectual functioning.  (R. at 267.)  Dr. Dachowski again encouraged Plaintiff to seek employment.

In July 2010, Dr. Dachowski noted Plaintiff was casually dressed, quiet, and reserved and that he maintained good focus and attention.  He reported that Plaintiff's overall condition had remained stable.  Plaintiff's father reported that a psychologist at a local mental health facility had assessed Plaintiff's intellectual abilities to be at the sixth to ninth grade level.  Dr. Dachowski noted that Plaintiff "is able to do well with all activities of daily living."  (R. at 311.)  Dr. Dachowski continued Plaintiff's diagnoses of OCD and borderline intellectual functioning.  (R. at 311-12.)

In January 2011, Dr. Dachowski described Plaintiff's overall mood as very good.  Plaintiff reported that he was "very pleased" that he was working a part-time position at Wal-Mart.  (R. at 322.)  Plaintiff added that he had been performing that position for approximately three or four months and that he was "enjoying it very much."  (*Id*.)  Plaintiff reported feeling a little tired but that he was getting used to going to work three or four times per week.  Dr. Dachowski also noted that Plaintiff appeared a little bit tired and reserved.  Dr. Dachowski advised Plaintiff "to keep up with a good work ethic and to get to work on time and to hold onto that position."  (*Id*.)  He continued Plaintiff on his medications.  Dr. Dachowski continued the diagnoses of OCD and borderline intellectual functioning.  (*Id*.)

The record reflects that Plaintiff established primary care with Murray S. Willock, M.D., in January 2010.  (R. at 305-06.)  Plaintiff reported waking up with back pain after pushing carts at Wal-Mart.  (R. at 321.)  Plaintiff mother indicated that she thought this was attributable to the fact that Plaintiff was unaccustomed to physical activity.  She also indicated that she was trying

to get Plaintiff a job involving stocking, being a greeter, and housekeeping at her place of employment so that they could share transportation.  (*Id.*)

In February 2011, Plaintiff reported that his low-back pain was improving and that he had resigned from his job at Wal-Mart because the job was frustrating and stressful.  Dr. Willock encouraged Plaintiff "to get out of the house more and get more physical activity and to gain some tolerance fo the physical work and the stressors associated."  (R. at 320.)

In January 2012, Plaintiff presented to Dr. Willock for a routine physical exam.  (R. at 327.)  Plaintiff's reported that he was having a hearing the following month for determination of social security benefits.   Dr. Willock described Plaintiff as "unchanged from prior exam."  (*Id*.)  He also noted that Plaintiff failed at a job pushing carts at Wal-Mart in the prior year "because his back hurt" and that he was turned down for employment when he reapplied.  (R. at 328.)  Dr. Willock concluded that Plaintiff was "pretty much disabled for normal age markers unless it would be a sheltered workshop situation."  (*Id*.)

**D.     Bureau of Vocational Rehabilitation**

In June 2009, Jacqueline Hines, a rehabilitation counselor at Bureau of Vocational Rehabilitation ("BVR"), evaluated Plaintiff to determine his eligibility for employment.  Ms. Hines determined that Plaintiff would have difficulty with job tasks that require extensive reading and math.  She also opined that Plaintiff would have increased anxiety when interacting with others and with changes in his regular routine.  (R. at 254.)  An Individualized Plan for Employment (IPE) was completed to help Plaintiff find a suitable job given his limitations, job placement, and job coaching.  (R. at 257-60.)  Plaintiff subsequently obtained a job with the assistance of BVR at Wal-Mart as a cart person.  (R. at 314-15.)  A December 30, 2010 Job

Coaching Summary reflects that Plaintiff had been acceptably performing the job.  He was reported to have "great attendance" and described to work well without redirection.  (*Id*.)  A BVR observer, who had observed Plaintiff for a total of eighteen hours on five separate occasions, noted that Plaintiff "works well with others and . . . does well to complete given tasks."  (R. at 315.)  The BVR observer further noted that Plaintiff interacted well with customers, displaying a positive attitude and being helpful.  (*Id.*)

**E.**  **Paul A. Deardorff, Ph.D.**

Plaintiff was evaluated by consulting psychologist Dr. Deardorff, on June 8, 2010.  (R. at 271-78.)  Plaintiff reported that he believed he was disabled because he was in special education classes throughout his academic career; because his reading, writing, and math skills are limited; and because he is anxious "maybe once a week" and depressed "without [his] medicine."  (R. at 271.)  Plaintiff told Dr. Deardorff that he had never held a job.  (R. at 272.)

Dr. Deardorff noted that Plaintiff appeared cooperative.  He also observed that Plaintiff was clean and neat in appearance and that his grooming and hygiene was adequate.  He further noted that Plaintiff appeared to be anxious, but that he displayed no other eccentricities.  Dr. Deardorff observed that Plaintiff displayed no loose associations or flight of ideas, as he was adequately organized and easily followed conversationally.  He described Plaintiff's receptive language skills as adequate.  Based upon Plaintiff's phraseology, grammatical structure, and vocabulary, Dr. Deardorff diagnosed Plaintiff with borderline intellectual functioning.  He noted that Plaintiff's articulation was not strong, but that he could be understood.  (*Id.*)

With regard to Plaintiff's cognitive functioning, Dr. Deardorff noted that Plaintiff's remote recall was adequate, but that his short-term memory was weak as he could recall only

10

three digits forward and three digits backwards.  He further noted that Plaintiff's attention and concentration skills were weak and that he could not perform serial sevens.  He also indicated that Plaintiff's arithmetic reasoning abilities were weak as he had difficulty with relatively simple addition and subtraction problems.  (*Id.*)

Plaintiff obtained a Verbal Comprehension Index of 81, a Perceptual Reasoning Index of 71 , and a Full Scale IQ of 66.  Dr. Deardorff noted that these scores indicate that Plaintiff is currently functioning in the mildly retarded range of intelligence or at about the first percentile for his age group.  (R. at 274.)

Dr. Deardorff diagnosed an anxiety disorder, not otherwise specified, and borderline intellectual functioning.  He assigned a Global Assessment of Functioning (GAF) score of 55.[2] (R. at 276.)  Dr. Deardorff opined that Plaintiff was moderately impaired in the four work-related mental abilities as a result of emotional difficulty and limited intellect.  (*Id.*)  He opined that Plaintiff would "likely have difficulty relating adequately to others in completing simple repetitive tasks."  (*Id*.)  He further opined that Plaintiff would have no difficulty understanding simple instructions, but that he may have difficulty retaining them given his weak short-term memory skills.  (*Id*.)  Dr. Deardorff added that Plaintiff's "pace may be slowed by his depressive symptomology."  (*Id*.)  He further opined that Plaintiff may experience deterioration in his attention and concentration skills over extended time periods, which could slow his performance.

---

[2]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning.  Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34 ("DSM-IV-TR").  A GAF score of 51-60 is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  DSM-IV-TR at 32-34.

Finally, Dr. Deardorff opined that work stress could increase his OCD behaviors and depressive symptomology. (*Id.*)

**F.        State-Agency Evaluations**

At the request of the state agency, John Waddell, Ph.D., reviewed Plaintiff's medical record in June 2010. (R. at 279-96.) According to Dr. Waddell, Plaintiff had mild restrictions in his activities of daily living; moderate difficulties in maintaining social functioning and concentration, persistence, and pace; and had experienced no episodes of decompensation. (R. at 289.) On the Mental Residual Functional Capacity Assessment, Dr. Waddell opined that Plaintiff was moderately limited in his abilities to locations and work-like procedures; to understand and remember very short and simple instructions; to understand and remember detailed instructions; carry out detailed instructions; to maintain attention and concentration for extended periods to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to ask simple questions or request assistance; to respond appropriately to changes in the work setting; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. (R. at 293-94.) Dr. Waddell accorded Dr. Deardorff's opinion regarding Plaintiff's work-related mental abilities weight and concluded that Plaintiff's statements were credible. (R. at 296.) He further concluded that Plaintiff retains the ability to understand, remember, and carry out simple instructions. Dr. Waddell also opined that Plaintiff can maintain attention and concentration for

12

simple, repetitive tasks and that he can relate to others on an occasional and superficial basis, as well as adapt to settings in which duties are routine and predictable.  (*Id.*)  State-agency psychologist Mel Zwissler, Ph.D., reviewed the record in September 2010 and affirmed Dr. Waddell's assessment.  (R. at 313.)

## G.    Education Records

Plaintiff received services from the Gallia County Board of Mental Retardation and Developmental Disability beginning in preschool.  (R. at 174-76.)  Records from Gallipolis City Schools show that Plaintiff was placed on an Individualized Education Plan ("IEP") for learning disabilities and developmental delay while he attended school.  (R. at 177-89.)  The Ohio Graduation Test Plaintiff took in 2006, when he was in the 10th grade, showed that he scored in the "basic" category and that he did "not meet state standards."  (R. at 190.)

## IV.    THE ADMINISTRATIVE DECISION

On March 12, 2012, the ALJ issued his decision.  (R. at 11-27.)  At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantially

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.     Is the claimant engaged in substantial gainful activity?
    2.     Does the claimant suffer from one or more severe impairments?
    3.     Do the claimant's severe impairments, alone or in combination, meet or
             equal the criteria of an impairment set forth in the Commissioner's Listing of
             Impairments, 20 C.F.R. Subpart P, Appendix 1?
    4.     Considering the claimant's residual functional capacity, can the claimant
             perform his or her past relevant work?
    5.     Considering the claimant's age, education, past work experience, and residual functional
             capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

gainful activity since February 26, 2010, the application date. (R. at 16.) The ALJ found that Plaintiff has the severe impairments of borderline intellectual functioning ("BIF") and anxiety disorder. (*Id.*) The ALJ also found that Plaintiff's OCD is not a severe impairment because it did not cause more than minimal limitations in Plaintiff's ability to perform basic work activities. (*Id.*) He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC"). The ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He is limited to simple, routine, repetitive tasks with one and two-step instructions that would involve only occasional decision-making and workplace changes (if any) in a static (unchanging) work environment. He can have occasional, superficial interaction with coworkers and supervisors but no interaction with the public.

(R. at 19.) In reaching this determination, the ALJ assigned "significant" weight to the opinions of the consulting psychologist, Dr. Deardorff, finding his assessment consistent with the record as a whole, including the mental health treatment notes. (R. at 24.) The ALJ also accorded "significant" weight to the assessments of the state-agency reviewing psychologists, Drs. Waddell and Zwissler, noting that the psychologists are experts in disability evaluation, that they had reviewed the record, and that their opinions were consistent with the evidence of record, including the consultative psychological evaluation/clinical interview. (*Id.*)

The ALJ rejected Dr. Willock's opinion that Plaintiff was disabled, reasoning that the record contained persuasive contradictory evidence. In support this statement, the ALJ noted that Dr. Willock's "own treatment records do not contain medical evidence that would support

the doctor's opinion that the claimant's mental impairments results in an inability to perform work-related activities on a sustained basis except in a sheltered workshop environment."  (R. at 23.)  The ALJ also noted that Dr. Willock's opinion was outside his area of expertise, explaining that Dr. Willock is a family practice practitioner.  (*Id.*)

The ALJ further concluded that although Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible.  (R. at 20.)

Relying on the VE's testimony, the ALJ concluded that jobs exist in the national economy that Plaintiff can perform.  (R. at 25-26.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 26-27.)

## V.    STANDARD OF REVIEW

 When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the

15

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2007)).

## VI.   ANALYSIS

In his Statement of Errors, Plaintiff asserts that the ALJ committed a number of errors

that warrant reversal.  Plaintiff first contends that the ALJ erred in finding that Plaintiff lacked

treatment for his severe impairments.  He next challenges the ALJ's failure to explicitly mention

Plaintiff's father's testimony.  Finally, Plaintiff maintains that the ALJ erroneously failed to

discuss all of the Dr. Deardorff's opinions.  The Court considers each of Plaintiff's arguments in

turn.

### A.    The ALJ's Consideration of Plaintiff's Treatment History

The Court finds Plaintiff's first contention of error to be without merit.  Within this

contention of error, Plaintiff challenges the ALJ's statement that his "treatment has been

essentially routine and/or conservative in nature."  (R. at 21.)  Plaintiff submits that the ALJ

improperly drew inferences from Plaintiff's treatment history without first exploring any

16

explanations for the treatment history. Plaintiff acknowledges that it appears that his treatment

was routine and conservative, but argues that the ALJ's consideration of this is erroneous given

that there is no cure for Asperger's Syndrome or BIF. Plaintiff also argues that contrary to the

ALJ's assertions, he did receive consistent treatment. In addition to the care he received from

the Holzer Clinic, Plaintiff cites the care he received from Drs. Woodland and Graham, as well

as his history of special education and receipt of vocational services.

      The ALJ mentioned Plaintiff's treatment history, along with a numerous other

considerations, within the context of assessing Plaintiff's credibility. He stated as follows:

> Although the claimant has received treatment for the allegedly disabling
> impairment, that treatment has been essentially routine and/or conservative in nature.
> In addition, the record reflects significant gaps in the claimant's history of treatment.
> Specifically, the record reflects the claimant received treatment from Holzer Clinic
> in February 2011 with no treatment until January 2012. Prior to that, in 2009 and
> 2010, the record reflects few if any problems with OCD, and the claimant was
> generally doing very well.
>
> Although the claimant testified that he has been prescribed and has taken
> flouxetine (brand name: Prozac), the use of the medication does not suggest the
> presence of an impairment which is more limiting than found in this decision. I note
> that claimant has not alleged any side effects from the use of fluoxetine.

(R. at 21 (internal record citations omitted).)

      Plaintiff's challenge to the ALJ's statement on the grounds that BIF and Asperger's

Syndrome have no cure is unavailing because these are not the impairments the ALJ was

referring to when discussing the routine and conservative nature of Plaintiff's treatment. Rather,

read in context, it is clear that the ALJ was evaluating Plaintiff's treatment for his alleged

anxiety disorder and OCD. The ALJ properly considered how frequently Plaintiff sought

treatment for these conditions and the level of intervention required. *See*, *e.g.*, *Rudd v. Comm'r

of Soc. Sec.*, 531 F. App'x 719, 727 (6th Cir. 2013) (minimal or lack of treatment is valid reason

to discount severity); *Despins v. Comm'r of Soc. Sec*., 257 F. App'x 923, 931 (6th Cir. 2007)

("The ALJ properly considered as relevant the fact that [the claimant's] medical records did not

indicate that [claimant] received significant treatment or medication . . . during the relevant time

period."); SSR 96–7p, 1996 WL 374186 (July 2, 1996) (in assessing credibility, the adjudicator

must consider, among other factors, "[t]he type, dosage, effectiveness, and side effects of any

medication the individual takes or has taken to alleviate pain or other symptoms" and

[t]reatment, other than medication, the individual receives or has received"); 20 C.F.R.

§ 404.1529(c)(3) (same).

Plaintiff's contention that the ALJ erroneously failed to consider other treatment and

intervention is equally unavailing.  Contrary to Plaintiff's assertions, in addition to the treatment

Plaintiff received from Holzer Clinic, the ALJ also explicitly considered Plaintiff's treatment

with Dr. Willock and the intervention Plaintiff received, including his participation in special

education curriculum, his IEP, and the services he received from the Bureau of Vocational

Rehabilitation.  (*See* R. at 21-23.)

**B.**     **The ALJ's Failure to Explicitly Evaluate Plaintiff's Father's Testimony**

Plaintiff next challenges the ALJ's failure to explicitly evaluate his father's testimony

within his decision.  In particular, Plaintiff maintains that the ALJ should have addressed each of

the following statements in his decision:

- Even though [Plaintiff] had a job coach and supervisor looking out for him, [he] still could not maintain employment.
- [Plaintiff] has a limited ability to read and write and was in developmentally handicapped classes and special education classes all throughout school.
- [Plaintiff] needs special reminders to take care of personal needs including reminders to change clothes.  Additionally he needs reminders to take his medications.
- [Plaintiff] is not comfortable with people in public.

18

- [Plaintiff] has difficulty understanding and following directions.
- [Plaintiff] does not have friends and is not comfortable interacting with even the store clerks on his own.

(Pl.'s Statement of Errors 9, ECF No. 10 (citations to the record omitted).) Plaintiff maintains that these comments translate into a more restrictive RFC and are supported by Dr. Willock's opinion that Plaintiff could only work under a sheltered workshop situation.

To the extent the ALJ erred in failing to explicitly analyze each of these comments, any such error is harmless. First, the ALJ, in great detail, discussed Plaintiff's testimony, in which he described most of the same limitations his father identified. (R. at 17, 19-21.) He additionally considered Plaintiff's reading and writing limitations within the context of discussing his academic records and testing results. (R. at 21-22.) The ALJ also considered job coaching notes, which discussed Plaintiff's performance during his time at Wal-Mart. (R. at 23.) In short, even though the ALJ did not explicitly address each of Plaintiff's father's comments, his decision did address the limitations that could be extrapolated from the testimony. *See Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 842 (6th Cir. 2005) (holding that ALJ's "failure to mention specifically" mother's statements regarding the claimant's limitations did not constitute reversible error where the ALJ engaged in a "lengthy discussion [regarding] the lack of objective evidence supporting these claimed physical limitations").

Second, Plaintiff fails to explain how the RFC the ALJ set forth does not accommodate the limitations that could be extrapolated from Plaintiff's father's testimony. For example, the RFC specifically accounts for Plaintiff's alleged challenges with directions and interacting with the public. (*See* R. at 19 (limiting Plaintiff to "simple, routine, repetitive tasks with one and two-step instructions that would involve only occasional decision-making and workplace

changes (if any) in a static (unchanging) work environment" where "[h]e can have occasional, superficial interaction with coworkers and supervisors but no interaction with the public").)  *See also Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 810 (6th Cir. 2012) (quoting *Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1056 (9th Cir. 2006)) (Where an ALJ "erroneously disregards a lay witnesses's testimony, the error is harmless if 'no reasonable ALJ, when fully crediting the testimony could have reached a different disability determination.'").

Third, even if Plaintiff's father's testimony, if accepted, would have required more restrictive limitations, those additional limitations are simply not supported by the objective evidence and the opinions that the ALJ found credible.  *See Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("The testimony of lay witnesses . . .  is entitled to perceptible weight only if it is fully supported by the reports of the treating physicians.").  Plaintiff's reference to Dr. Willock's opinion is unavailing given that the ALJ offered good reasons for rejecting his opinion, a determination that Plaintiff does not challenge.

Finally, regardless of whether the ALJ erred in failing to explicitly discuss Plaintiff's father's comments, the Court finds that substantial evidence exists supporting his ultimate credibility determinations.  Accordingly, the Court determines that any such error is harmless. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (holding that when an ALJ relies on invalid reasons for discounting credibility, it amounts to harmless error so long as substantial evidence exists supporting the ALJ's conclusions on credibility); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) (finding no reversible error where the ALJ failed to explicitly consider opinion evidence, explaining that the Court may still look at the evidence in determining whether the ALJ's opinion is based upon substantial evidence).

20

**C.      The ALJ's Evaluation of Dr. Deardorff's Opinion**

Within his final contention of error, Plaintiff submits that had the ALJ considered and credited all of Dr. Deardorff's comments, Plaintiff's RFC "would be impacted significantly." (Pl.'s Statement of Errors 10, ECF No. 10.)  Plaintiff accuses the ALJ of impermissibly "cherry-picking" from select portions of Dr. Deardorff's opinion.  (Pl.'s Reply 3–4, ECF No. 18.)

Plaintiff's final contention of error lacks merit.  Contrary to Plaintiff's assertion, the ALJ did not disregard portions of Dr. Deardorff's opinion.  Rather, he *explicitly* noted each of the comments that Plaintiff outlines in his brief.  (*Compare* Pl.'s Statement of Errors 10, ECF No. 10, *with* the ALJ's Dec., R. at 23-24.)  Because Dr. Deardorff was not a treating physician and had only examined Plaintiff once, the ALJ's thorough discussion of Dr. Deardorff's opinion was more than sufficient.  *See, e.g.*, *Pasco*, 137 F. App'x at 839 (concluding that ALJ's failure to discuss a consultative neurologist's report was not error because the neurologist was not a treating physician).  In addition, Dr. Deardorff's opinions, even if accepted in their entirety, do not, as Plaintiff suggests, necessarily require a more restrictive RFC than the ALJ set forth, especially in view of the other record evidence the ALJ considered in formulating Plaintiff's RFC.  Further, as the Commissioner points out, the ALJ accorded Dr. Deardorff's opinion significant, but not controlling weight.  He also accorded the opinions of state-agency physicians Drs. Waddell and Zwissler significant weight, both of whom reviewed and assessed the record evidence, including Dr. Deardorff's opinions.

## VII.      DISPOSITION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, Plaintiff's Statement of Errors is **OVERRULED** and the Commissioner of Social Security's decision is **AFFIRMED**.

**IT IS SO ORDERED**.


Date:  September 24, 2014                      /s/ *Elizabeth A. Preston Deavers*
                                              Elizabeth A. Preston Deavers
                                              United States Magistrate Judge